**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| | : |
| G.A. by and through his parents L.A. and A.A., | : Civil Action No. 11-3801 (FSH) |
| L.A., and A.A., | : |
| Plaintiffs, | : |
| | : |
| v. | : **OPINION** |
| | : |
| RIVER VALE BOARD OF EDUCATION, | : |
| | : |
| Defendant. | : Date: September 18, 2013 |
| | : |

**HOCHBERG, District Judge:**

This matter comes before the Court upon the parties' Cross-Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56, Plaintiffs' additional Cross-Motion for Summary Judgment with respect to post-administrative hearing expenses, and the parties' Joint-Motion seeking to expand the record. Plaintiffs seek review of an Administrative Law Judge ("ALJ") decision on claims brought pursuant to the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. §§ 1400, et. seq. The Court has considered the arguments of the parties without oral argument pursuant to Federal Rule of Civil Procedure 78.

### I. BACKGROUND

G.A., a six year-old boy, attended preschool at Temple Beth El in Closter, New Jersey, during the 2009-2010 school year, where he was screened for speech problems. After medical consultation, he was diagnosed with ankyloglossia, speech delay, and unilateral sensorineural hearing loss in his left ear. A private speech and language therapist, Julia Weksler, conducted an

additional evaluation in March 2010, which confirmed G.A.'s hearing loss. He began therapy with Ms. Weksler twice per week. Several different evaluations place G.A.'s hearing loss in his left ear between mild and moderate-severe; his right ear is hearing normal. According to the evaluations, G.A.'s hearing loss is moderate at low and high frequencies and mild at middle frequencies.

G.A.'s mother, Plaintiff L.A., sent a letter to Defendant River Vale Board of Education (the "Board") on March 4, 2010, notifying the Board of G.A.'s hearing impairment and requesting an evaluation. Upon receiving the letter, the Board asked permission for the school nurse to conduct screening of G.A. The Child Study Team ("CST") also scheduled a meeting with his parents to discuss special education planning for March 25, 2010, to determine the nature and scope of the evaluations. After the meeting, the Board requested parental consent to conduct testing, including psychological, speech and language, and physical therapy evaluations. L.A. signed the consent form on April 11.

### (a) The Board's 2010-11 Proposed Individualized Education Program

Between May and July of 2010, G.A. was evaluated by a private pediatric audiologist, a private speech and language therapist, the district physical therapist, and the district psychologist. CST member Carol Beierle also observed his private preschool classroom at Temple Beth El on June 7, 2010. On July 16, the Board convened the IEP meeting and Eligibility/Classification conference. L.A., case manager Beierle, and district teacher Lisa Dalto were present. At the meeting, the district provided a draft Individualized Education Program ("IEP") recommending placement at the Roberge School, an in-district school that had an integrated program and a self-contained program. L.A. objected to the self-contained program

because students were removed from the general population.  The Board changed its IEP to recommend placement in the integrated program, which has an even proportion of disabled and non-disabled students.  Ten days after the initial IEP meeting, July 26, the district forwarded the proposed IEP to Plaintiffs.

The proposed IEP provided for speech and language therapy twice per week, physical therapy once per week, an FM hearing aid, and placement in the Roberge integrated preschool classroom with special education qualified teachers and aids.  It did not provide for extended school year ("ESY"), occupational therapy, transportation, individual therapy, or an ear-level personal hearing aid.

G.A.'s parents objected, did not sign the consent form, and, on Aug. 2, 2010, initiated a due process hearing with the New Jersey Office of Special Education Programs.  Among other things, Plaintiffs challenged the Board's placement at Roberge as denying G.A. a free and appropriate public education ("FAPE").  Plaintiffs also requested reimbursement for services they paid for during the summer months ("ESY"), reimbursement for a hearing aid, and alleged numerous procedural violations of the IDEA.  When the 2010-11 school year started, the parents still had objections and the Board would not permit G.A. to start the school year at Roberge without signed consent.  For that year, G.A. attended school at Temple Beth El.


**(b) Administrative Proceedings**

Over the course of four months, there were eight days of hearings, taking place on December 13, 2010, January 3, 2011, January 18, January 20, February 7, February 14, March 7, and March 21.  ALJ Kelly Kirk reviewed 76 exhibits and heard testimony from ten witnesses, including five witnesses for the Plaintiff: L.A.; Kimberly Auerbach, M.S., CCC-A, a pediatric

audiologist; Amy Nelson, director of Temple Beth El's nursery school; Julia Weksler, M.S., CCC/SLP, a private speech and language therapist; and Chaye Lamm Warburg, DPS, OTR/L, a private occupational therapist. Defendant called five witnesses: Carol Beierle, LDTC, G.A.'s case manager; Beth Bargetzi, the Board psychologist; Maria Rohsler, the Board speech/language therapist; Lisa Benecaso, certified special education and general education teacher; and Joelle DeGaetano, a school social worker. On April 14, 2011, Judge Kirk issued a 59-page opinion with 17 specific findings of fact and 18 conclusions of law, ultimately denying most of Plaintiffs' claims for educational reimbursement. The relevant findings include:

(1) both parties were at fault for a 54-day procedural delay in implementing the IEP;

(2) the Board would not have been able to evaluate G.A. for speech and language therapy or audiological needs within the statutory timeframe; therefore, the Board must reimburse Plaintiffs for their private evaluations in June and July 2010;

(3) despite certain procedural issues, G.A. was not deprived of meaningful educational benefit;

(4) the Board's proposed hearing aid, a desk level FM system, provided G.A. meaningful educational benefit, whereas the Plaintiff's requested aid, an ear level FM system, was not required for G.A. to receive a FAPE;

(5) G.A.'s scores in the speech and language therapy evaluation were within the average range and that small group speech and language therapy two times per week was sufficient to address G.A.'s speech and language deficits;

(6) the Board's proposed physical therapy regimen of one 30-minute session per week, as recommended by the physical therapist, was appropriate, and that there was no evidence that G.A. required individual therapy, rather than group;

(7) considering reports of G.A.'s progress over breaks, observation, and regression and recoupment analysis, no ESY programs were warranted;

(8) although G.A. required occupational therapy, which the Board did not provide in the IEP, its failure was excused because Plaintiffs did not provide sufficient time to conduct an occupational therapy evaluation before filing a due process challenge;

(9) As an interim measure, the ALJ ordered that G.A. receive occupational therapy once per week for 45 minutes until the Board conducts its own evaluation of G.A.'s needs;

(10) G.A.'s placement at Roberge Preschool, a structured program with about half special education and half general education students, classroom aides, certified special education teachers and numerous professionals, constituted a FAPE in the least restrictive environment; and

(11) alternatively, the district was relieved of its duty to implement an IEP and provide related services because Plaintiffs refused to consent to the proposed IEP.

Regarding the hearing aid, the ALJ discussed the three types of relevant devices. The first was a personal hearing aid, which is a device that is placed in the user's ear. The "ear-level" hearing aid amplifies sound directly and does not use an FM microphone. There were also FM aids, which operate by having a teacher speak into a microphone that broadcasts the FM signal to an amplification device near the student. There were two types of contested FM aids here: a coupled-aid, which is an FM aid that clips into an ear-level hearing aid and acts as a supplement; and a desktop FM speaker, which sits on the student's desk and amplifies the teacher's voice.

Relying on the audiological evaluation, the Board originally offered an unspecified FM hearing aid in the IEP. Believing that G.A.'s parents purchased an ear-level hearing aid on their own, the CST offered Plaintiffs the FM coupled aid to supplement his ear-level aid. Plaintiffs

informed the Board that they had not yet purchased the ear-level aid and requested that the Board provide one at no cost. When L.A. and the Board could not agree on payment for a personal ear-level hearing aid, the Board offered a desktop-level FM speaker.

Relying on *Letter to Seiler*, 20 I.D.E.L.R. 1216 (OSEP 1993), the ALJ noted that the question of whether assistive technology, like audiological aids, should be provided by the school free of charge is decided on a case-by-case basis. The Board must purchase a hearing aid only where the student requires access to that particular device to receive a FAPE and it is specified in the IEP. In this case, the ALJ determined that either a desk-aid or the ear-level aid would have provided G.A. with meaningful benefit. Judge Kirk also noted that the December Auerbach Report recommended "daily use of monaural hearing aid during all waking hours." Thus, she found that it was a hearing aid for personal, not specifically for educational and therapeutic use. Consequently, the ALJ concluded that G.A.'s hearing loss in his left ear could be adequately addressed using the Board's proposed desktop FM system, which would provide meaningful educational benefit in the classroom.

Regarding reimbursement for Plaintiffs' private placement at Temple Beth El, the ALJ credited the testimony of Carol Beierle, who testified to her observations of G.A. at the private school, stating that that Temple Beth El preschool program consisted mostly of play activities without academic services. The ALJ concluded that Temple Beth El was inappropriate because it was an ordinary program, which failed to provide "disability-specific methodologies, programs or services … to specifically address G.A.'s particular delays, deficits or disabilities." Judge Kirk additionally found that Roberge was an appropriate mainstream placement because disabled students were educated with general education students as required by law.

As to compensation for therapy and evaluations, the ALJ found that the Board would not have been able to evaluate G.A. until two months after the statutory deadline. Although ESY was not warranted for the summer months, the ALJ awarded reimbursement for private speech and language therapy during June and July as a remedy for the months that the Board was late in conducting the evaluation. This included eight therapy sessions provided by JJW Speech Associates in 2010. She refused reimbursement for prior months of therapy, because at that time, the Board was still within the statutory deadline.

Plaintiffs also sought compensation for a number of private evaluations, including: three speech therapy evaluations by Weksler on Feb. 8, 2010, May 7, 2010, and May 12, 2010; and a March 2, 2010, audiological evaluation by Auerbach. The ALJ denied reimbursement for evaluations before March 4, 2010, as the Board was not yet aware of G.A.'s disability and had no duty to conduct evaluations. The Board, however, could not have conducted the May 2010 evaluations before the expiration of the deadline, so Plaintiffs were reimbursed for those evaluations. The ALJ noted, however, that these additional evaluations were conducted, not to discover the extent of G.A.'s hearing loss, but because G.A.'s father refused to accept that his son was hearing impaired.

### (c) Post-Hearing

After the hearing, Defendant paid $1,390 to Plaintiffs in accordance with the ALJ's ruling on reimbursement. The Board also provided a proposed 2010-11 IEP that included the ALJ's two modifications on May 4, 2011, providing for occupational therapy and small group speech and language therapy.

There is no dispute that the Board revised the IEP to include the provisions the ALJ specifically ordered; however, Plaintiffs rejected this revised 2010-11 IEP. They also rejected a draft IEP for the 2011-12 school year and filed a due process challenge on Sept. 2, 2011. Four days later, Plaintiffs filed a complaint with the New Jersey Department of Education, Office of Special Education, regarding the 2011-12 year. Plaintiffs withdrew their due process petition without prejudice or settlement, which they agreed to do because the Board offered to conduct further testing. The Board provided a neurological evaluation on Nov. 23, 2011, a physical therapy evaluation on Nov. 28, 2011, an occupational therapy evaluation on Dec. 5, 2011, an educational evaluation on Dec. 21, 2011, and a psychological evaluation on Dec. 20, 2011.

On Feb. 2, 2012, Plaintiffs consented in part and rejected in part the Board's proposed IEP for 2011-12, consenting to related services and objecting to placement. On Aug. 28, 2012, Plaintiffs signed and consented to the 2011-12 IEP, reserving their right to challenge it. In September, G.A. began attending kindergarten at Roberge.

### (d) Procedural History

Plaintiffs filed the Complaint on Sept. 25, 2011. On March 5, 2012, this Court dismissed every count of the Complaint with the exception of the IDEA claim, and dismissed all Defendants other than River Vale Board of Education. (ECF No. 68). The parties filed a joint motion to expand the record on Oct. 9, 2012. Defendant River Vale filed a motion for summary judgment on Nov. 20, 2012 and Plaintiffs filed for partial summary judgment on Nov. 21, 2012, and a cross-motion on Dec. 26, 2012.

## II. STANDARD OF REVIEW

Under the IDEA, any party aggrieved by the findings an administrative decision may seek review of the decision at a district court. The reviewing court shall receive the administrative record, "hear additional evidence" upon request, and base its decisions upon "the preponderance of the evidence," granting "such relief as the court determines appropriate." 20 U.S.C. § 1415(i)(2)(C). The party "challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012).

In IDEA cases, the district court decides motions for summary judgment based on the administrative record and any additional evidence. *M.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002). Accordingly, the standard of review is different from the typical summary judgment motion. *M.S. v. Mullica Twp. Bd. of Educ.*, 485 F. Supp. 2d 555, 566 (D.N.J. 2007). Instead, the "District Court applies a modified version of *de novo* review and is required to give due weight to the factual findings of the ALJ." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006); *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 271 (3d Cir. 2003) ("[F]actual findings from the administrative proceedings are to be considered prima facie correct."). The purpose of affording "due weight" to the administrative proceedings is to prevent the courts from imposing "their own notions of sound education policy." *See Susan N. v. Wilson Sch. Dist.* 70 F.3d 751, 757 (3d Cir. 1995) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Ctny. v. Rowley,* 458 U.S. 176, 206 (1982)).

Under the "due weight" standard, the Court is required "to consider – although not necessarily to accept – the administrative fact findings." *Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 529 (3d Cir. 1995). If the Court departs from the ALJ's findings, it must find factual

support in the record and "fully explain[] its reasons for departing from the state decision." *S.H.,* 336 F.3d at 270-71. Credibility determinations by the ALJ, who heard live testimony, are entitled to special weight "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *Shore Reg'l High Sch. Bd. of Educ. v. P.S.,* 381 F.3d 194, 199 (3d Cir. 2004) (quoting *Carlisle*, 62 F.3d at 529). The ALJ's legal determinations, however, are reviewed *de novo. See, e.g., P.N. v. Greco*, 282 F. Supp. 2d 221, 235 (D.N.J. 2003).

## III.  ADDITIONAL EVIDENCE & ISSUES

In reviewing an administrative order, the IDEA states that the district court "shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C). The Third Circuit permits the introduction of additional information to supplement the administrative record, such as when there were "gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing." *Susan N. v. Wilson Sch. Dist.,* 70 F.3d 751, 759 (3d Cir. 1995) (quoting *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 790 (1st Cir. 1984), aff'd 471 U.S. 359 (1985)). The *Susan N.* Court did not delineate a bright-line rule for admitting additional evidence, leaving the decision at the discretion of the district court. 70 F.3d at 760. A district court's discretion does not extend, however, to summarily exclude additional evidence provided by a party without analysis. *Id.* at 758. Instead, the court reviewing the administrative record must analyze whether the proffered evidence is "relevant, non-cumulative and useful in determining whether Congress' goal has been reached for the child involved." *Id.* at 760. After admitting additional evidence, the district court is "free to accept or reject the agency findings depending on whether those findings are

supported by the new expanded record and whether they are consistent with the requirements of the Act." *S.H.,* 336 F.3d at 270 (quoting *Oberti v. Bd. of Educ. of Clementon Sch. Dist.*, 995 F.2d 1204, 1220 (3d Cir. 1993)).

Before the Court is the parties' joint request to supplement the administrative record with additional evidence (ECF No. 100). Plaintiffs seek to introduce 54 additional exhibits and Defendant seeks 16 new exhibits.

### (a) Post-Hearing Evidence & Issues

By far, the majority of the parties' requests relate to events that occurred after the administrative hearing. In accepting evidence relating to events after the administrative hearing, there is added "danger[] inherent in this process of second-guessing the decisions of a school district with information to which it could not possibly have had access at the time it made those decisions …." *Susan N.*, 70 F.3d at 762. Nor was it available to the hearing officer in determining the reasonableness of the district's plan. *Metro. Bd. of Pub. Educ. v. Guest*, 193 F.3d 457, 462 (6th Cir. 1999) ("[F]ederal courts - generalists with no expertise in the educational needs of handicapped students - are given the benefit of expert factfinding by a state agency devoted to this very purpose."). Because of the "great" risk of using hindsight, courts weighing whether to admit "after-acquired evidence" are instructed to examine this evidence "carefully." *Susan N.*, 70 F.3d at 762.

On the one hand, there is an interest in limiting after-acquired evidence to give due weight to the specialized tribunal's proceedings. That the Court may make new findings "does not mean that courts are free to substitute their own notions of sound education policy for those of the educational agencies they review, but rather that they should give 'due weight' to the

administrative proceedings." *Susan N.*, 70 F.3d at 757 (quoting *Rowley*, 458 U.S. at 205-206).

Thus, the starting point and focus of review by the district court is the administrative record. *See Susan N.*, 70 F.3d at 759. In examining additional evidence, District courts "must not allow 'such evidence to change the character of the hearing from one of review to a trial *de novo.*'" *See Bernardsville Bd. of Educ. v. J.H.*, 42 F.3d 149, 161 (3d Cir. 1994) (quoting *Burlington*, 736 F.2d at 790-91). Nearly every circuit has echoed this concern. *See Springer v. Fairfax Cnty. Sch. Bd.*, 134 F.3d 659, 667 (4th Cir. 1998); *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 851 n.8 (6th Cir. 2004); *Monticello Sch. Dist. No. 25 v. George L.,* 102 F.3d 895, 901 (7th Cir.1996); *E.M. v. Pajaro Valley Unified Sch. Dist.,* 652 F.3d 999, 1004 (9th Cir. 2011); *L.B. v. Nebo Sch. Dist.,* 379 F.3d 966, 974 (10th Cir.2004); *Walker Cnty. Sch. Dist. v. Bennett*, 203 F.3d 1293, 1298-99 (11th Cir. 2000); *Andersen v. Dist. of Columbia*, 877 F.2d 1018, 1025 (D.C. Cir. 1989).

On the other hand, there is an interest that favors accepting evidence, even though acquired after the fact, if it helps accomplish Congress' goal of ensuring that disabled children are making educational progress. *Susan N.*, 70 F.3d at 760. "Children are not static beings; neither their academic progress nor their disabilities wait for the resolution of legal conflicts." *Id.* For this very reason, courts are directed to "decide independently whether the requirements of the IDEA are met." *See id.* at 757 (quoting *Murray v. Montrose Cnty. Sch. Dist.*, 51 F.3d 921, 927 (10th Cir. 1995)). Considering these different interests, post-administrative-hearing evidence should be admitted where helpful to determining whether a child is making educational progress, but used:

> only in assessing the reasonableness of the district's initial decisions regarding a particular IEP or the provision of special education services at all. Courts must be vigilant to heed Judge Garth's warning that "[n]either the statute nor reason

countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement."

*Susan N.*, 70 F.3d at 762. (quoting *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993)).

Considering the parties' proposed exhibits through that lens, Plaintiffs proffer the following after-acquired evidence: (1) four evaluations of G.A. conducted by the Board after the hearing;[1] (2) a number of receipts for therapy and special education from Dec. 28, 2010 to the summer of 2012; (3) four letters between the Board and L.A. regarding G.A.'s 2010-2011 IEP;[2] (4) a number of letters and email exchanges between the Board and L.A. regarding G.A.'s 2011-12 IEP meeting and its implementation;[3] and (5) several 2012 requests for additional evaluations.[4] Defendant seeks entry of the following after-acquired evidence: (6) a March 3, 2012, investigation report by the Office of Special Education, initiated by L.A., finding that the district followed proper procedures in evaluating G.A. and creating an IEP for the 2011-2012

---

[1] This includes: a June 24, 2011, speech and language progress note; a Dec. 5, 2011, occupational therapy evaluation; a February 24, 2012, audiological evaluation; and an August 31, 2012, assistive technology evaluation.

[2] This includes: L.A.'s April 28, 2011 letter, to the CST; May 4, 2011, emails between the parents and the board regarding the IEP meeting and CST; and a May 12, 2011, letter from the CST to the parents.

[3] This includes: L.A.'s August 10, 2011, letter requesting an IEP meeting; the Board's August 19, 2011, letter denying the request for an IEP meeting; an August 23, 2011, letter to the Board; a September 16, 2011, set of emails regarding related services; L.A.'s September 21, 2011, letter to the Board requesting services; L.A.'s January 12, 2012, letter to the Board; the Board's January 18, 2012, letter to L.A. regarding related services; L.A.'s February 2, 2012, parental consent to the IEPs; and a February 20, 2012, letter from the Board regarding consent.

[4] This includes: a February 4, 2012, parental request for an assistive technology evaluation; a February 30, 2012, email from the District denying the assistive technology evaluation; and Plaintiffs' July 25, 2012, stipulation to withdraw their 2011-12 due process petition without prejudice in exchange for the Board providing G.A. with an assistive technology evaluation.

school year; (7) a number of letters between L.A. and the Board regarding the 2011-2012 IEP;[5] (8) a Jan. 5, 2011, letter from L.A. regarding the Dec. 28, 2010, audiological report; and (9) letters from the Board to L.A. for reimbursement and scheduling of evaluations following the ALJ's decision.[6]

As to category (1), these different evaluations shed some light on G.A.'s educational progress since the hearing. Evaluations conducted after an administrative hearing may be admitted, with the understanding that they bear little relevance as to whether the district's proposed program was reasonably calculated to provide meaningful educational benefit. *See Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 530 (3d Cir. 1995) ("appropriateness is judged prospectively so that any lack of progress under a particular IEP, assuming arguendo that there was no progress, does not render that IEP inappropriate."); *R.S. v. Montgomery Twp. Bd. of Educ.*, No. 10-5265, 2012 WL 2119148, *5 (D.N.J. June 11, 2012) (excluding the majority of four post-hearing reports, but permitting sections relevant to the District's understanding at the time of the IEP); *S.K. v. Parsippany-Troy Hills Bd. of Educ.*, No. 07-4631, 2008 WL 4561512, *9 (D.N.J. Oct. 9, 2008) (admitting after-acquired evaluations for the limited purpose of examining how the student fared in the district's placement). Here, since these reports make references to how G.A. has developed since he was originally evaluated, they are admitted to the limited extent that they shed light on what the Board knew at the time.

---

[5]  Including: an April 28, 2011, Board request for parental participation in an IEP meeting; a May 12, 2011, Board letter forwarding the IEP as revised by the ALJ; an August 10, 2011, letter from L.A. to the Board regarding G.A.'s placement at Temple Beth El; a February 2, 2012, parental consent letter regarding related services; and an August 28, 2012, signed parental consent letter.
[6]  This includes: the Board's May 24, 2011, letter to L.A. regarding implementation of the ALJ's order; and a November 18, 2011, letter scheduling evaluations.

The receipts in category (2) are admitted because they reflect G.A.'s expenses for private therapy. If the Board had a continuing obligation to offer services, these are relevant to the amount of reimbursement. Although category (3) involves correspondence after the hearing, it references statements made at the time the 2010-2011 IEP was created and reflects the Board and Plaintiffs' understanding of the document. Those exhibits are admitted.

Categories (4), (5), (6), and (7) all relate to the implementation of the 2011-12 IEP. Only the 2010-11 IEP was challenged at the administrative proceeding, and it is the only program properly before the Court. To the extent that the parties seek to widen the scope of review and litigate issues that arose subsequent to the underlying administrative proceeding, those claims will not be entertained. *See Jeremy H. v. Mount Lebanon Sch. Dist*., 95 F.3d 272, 283–84 (3d Cir. 1996) (affirming district court's finding that claims arising after conclusion of administrative hearing, as well as claims not raised during the hearing, must be litigated at the administrative level and cannot be raised in a due process appeal); *Metro. Bd. of Pub. Educ. v. Guest*, 193 F.3d 457, 463 (6th Cir. 1999) ("[T]he district court exceeded its jurisdiction to the extent it used additional evidence to rule upon issues beyond those presented to the ALJ."). In *Guest*, the district court admitted additional evidence regarding the suitability of the parents' placement at a private facility and ruled on the appropriateness of IEPs developed after the administrative hearing. *Id.* The Sixth Circuit reversed, ruling that plaintiffs must first seek due process review of both the appropriateness of the placement and the subsequent IEPs, rather than challenge them at the district court. *Id.*.

Here, many of the arguments Plaintiffs raise in their cross-motion relate to claims that were not argued before the ALJ in 2010. This includes arguments related to the district's failure to conduct certain evaluations in implementing the 2011-12 IEP, the appropriateness of the

Board's proposed placement at Woodside Elementary School for the 2011-12 year, and Plaintiffs' private placement at Blue Rill for the 2011 summer.  (Pls.' Br. in Supp. of Cross-Mot. for Summ. J., ECF No. 117-1).  On these 2011-2012 issues, Plaintiffs filed a due process challenge on September 2, 2011, with the Office of Administrative Law, but withdrew the petition in December 2011 without prejudice.  (Pls.' Br. in Opp'n to Mot. for Summ. J. Ex. T, ECF No. 116-21).  On claims that were not raised before the ALJ, the administrative exhaustion requirement is not met.  The exhaustion requirement is excused only where exhaustion would be futile or inadequate, an emergency exists which would cause irreparable harm if exhaustion were required, or the issues are purely legal.  *See Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778-79 (3d Cir. 1994).  A due process hearing would not be futile since the administrative process was capable of determining Plaintiffs' properly exhausted claims in this action.  *See Centennial Sch. Dist. v. Phil L.*, 799 F. Supp. 2d 473, 480 n.3 (E.D. Pa. 2011) (excluding from consideration IDEA issues not explicitly raised in the due process hearing for failure to exhaust administrative remedies).  There is no dispute that G.A. is now attending the Roberge kindergarten school and receiving the services listed in his IEP, indicating a lack of an emergency.  Finally, the issues raised are not purely legal because they relate to G.A.'s development and the Board's conduct in the years after the administrative hearing, where there are disputed issues of fact.  Consequently, the post-hearing claims relating to the 2011-12 IEP are dismissed.  If Plaintiffs wish to litigate these issues, they must be pursued first at the administrative level.

Turning to whether this evidence may be admitted, not for the purpose of this Court rendering judgment on subsequent claims, but for interpreting the reasonableness of the Board's conduct in 2010-11, the Court declines to admit the exhibits into evidence.  After the 2010-11

IEP was challenged, the Board conducted four additional evaluations and had a series of discussions with Plaintiffs to develop the 2011-12 IEP. The evidence they offer includes numerous disputes between the Board and Plaintiffs about the content of the new 2011-12 IEP, the adequacy of the Board's consideration of the new evaluations, its willingness to conduct new evaluations, and the Office of Special Education Investigation Report on the Board's compliance with procedures for the 2011-12 IEP.

In a similar case, *Bernardsville*, the district court reviewed an ALJ's determination regarding the appropriateness of a student's IEPs for the years 1987-88, 1988-89 and 1989-90. *Bernardsville Bd. of Educ. v. J.H.*, 42 F.3d at 149, 161 (3d Cir. 1994). It excluded the parties' additional evidence as to IEPs developed subsequently, in 1990-91, because it "was irrelevant to the issue of the appropriateness of the public education" offered in the challenged years. *Id.* Affirming the district court's decision to exclude this post-hearing evidence, the Third Circuit held that the district's "performance with regard to the IEP it developed for J.H. for the 1990-91 school year and for prospective years are not at issue …." *Id.* Here, while G.A.'s 2011-12 IEP has content similar to the 2010-11 IEP at issue, the evidence the parties offer relates to the procedural disputes surrounding the creation of the 2011-12 IEP. Evidence of the Board's alleged procedural violations in 2011 and 2012 are unhelpful to determining the adequacy of the IEP presented on July 26, 2010. Categories (4), (5), (6), and (7), each relating to the Board's conduct for the 2011-12 school year, are excluded.

Category (8), a letter purportedly showing which evidence the ALJ considered regarding the hearing aid, is excluded as cumulative.

Defendant claims category (9) demonstrates the Board's compliance with the administrative order. It is an open question whether a district court can enforce compliance with

an administrative order, or whether the Plaintiffs must return to the administrative body. *See Jeremy H. v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 278 (3d Cir.1996); *James S. v. Sch. Dist. of Phila.*, 559 F. Supp. 2d 600, 614-15 (E.D. Pa. 2008) (noting that since plaintiffs may no longer enforce administrative orders via § 1983, based on the ruling in *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007), no court in the Third Circuit has addressed whether Plaintiffs may enforce compliance with administrative decisions via the IDEA).

Here, it is undisputed that Defendant complied with the order inasmuch as it reimbursed Plaintiffs for evaluations and therapy. Moreover, Plaintiffs do not allege that the Board failed to include the ALJ's ordered relief of occupational therapy and small group speech and language therapy. (Pls.' Cross-Mot. for Summ. J. 3, ECF No. 117-1 at 9). Instead, Plaintiffs claim noncompliance based on the Board's failure to consider additional issues "beyond simply amending the IEP per the ALJ's directive." *Id.* This is less a claim to enforce the ALJ's order, but rather an extension of Plaintiffs' claims that the Board committed procedural violations in developing the subsequent IEP for 2011-12. It is properly addressed at the administrative level if Plaintiffs challenge the 2011-12 IEP. Thus, category (9) evidence relating to the Board's compliance is denied.


### (b) Evidence Available, but not Admitted, at the Time of the Administrative Hearing

Turning to additional evidence that existed at the time of the hearing but was not admitted into evidence, Plaintiffs offer the following categories of documents: (1) several copies of the 2010-2011 proposed IEP; (2) Temple Beth El nursery school director Amy Nelson's resume; (3) an August 23, 2010, letter regarding the resolution meeting; (4) Board e-mails

related to the Board's deliberation on whether to observe G.A. at Temple Beth El in 2010;[7] (5) a copy of Temple Beth El's NAEYC certificate of accreditation; (6) a Rifton Chair user manual. Defendant offers: (7) an information pamphlet on the stand alone FM classroom speaker; (8) letters requesting parental participation and a contact sheet for the 2010-11 IEP;[8] and (9) a December 29, 2010, letter regarding the Board's observation of the Temple Beth El program.

The first three groups, (1), (2), and (3), are admitted without objection. Categories (4) and (5) are admitted insofar as they relate to whether the Board adequately investigated a continuum of placements for G.A., including accredited private schools such as Temple Beth El. *See T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 579-80 (3d Cir. 2000). As to category (6), the Rifton Chair manual was excluded at the administrative hearing based on Plaintiff's failure to produce the document in advance of trial. (Tr. 48:14-49:23, Jan. 3, 2011). Nevertheless, several witnesses, Amy Nelson, Carol Beierle, Lisa Benincaso, and Chaye Lamm Warburg all were questioned about the Rifton chair. The proffered manual provides a non-cumulative description of the equipment, which places their testimony into context. It is admitted for that limited purpose. For similar reasons, Defendant's information on the desktop speaker is admitted for that limited purpose. To the extent that categories (8) and (9) explain Defendant's reasons for procedural delay in developing the 2010-2011 IEP, they are admitted.

Finally, Plaintiffs offer the deposition testimony of Lisa Dalto, who was not deposed before the administrative hearing, but who was present during the 2010-2011 IEP meeting. Defendant argues that Ms. Dalto was not procedurally unavailable at the time of the hearing.

---

[7] This includes a series of May 28, 2010, inter-district emails.
[8] This includes: the Board's July 7, 2010-September 13, 2010, contact sheet and the record of the case manager; the Board's July 13, 2010, request for parental participation; a July 26, 2010, letter requesting parental consent to the IEP; and a September 3, 2010, email exchange regarding consent to the IEP.

The Third Circuit noted that the *Burlington* Court declined to adopt a categorical rule barring all witnesses who could have testified at the administrative hearing from offering evidence at the district court. *Susan N. v. Wilson Sch. Dist.,* 70 F.3d 751, 759-60 (3d Cir. 1995) (quoting *Town of Burlington v. Dep't of Educ.,* 736 F.2d 773, 790 (1st Cir. 1984)). Such "a rigid rule to this effect would unduly limit a court's discretion and constrict its ability to form the independent judgment Congress expressly directed." *Id.* Here, although Ms. Dalto could not remember any of the specifics of the meeting, her testimony may be useful to determine whether the Board followed the procedures at issue. It is admitted.

## IV. IDEA FRAMEWORK

In enacting the IDEA, Congress required all states receiving federal education funding to provide every disabled student in their districts with a "free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1412(a)(1)(A); *see Forest Grove Sch. Dist. v. T.A.,* 557 U.S. 230, 239 (2009). To accomplish this, districts must specially create a program for each "handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley,* 458 U.S. 176, 188-89 (1982). School districts achieve this goal by first evaluating the student, and then discussing the results in a meeting with the student's parents, teachers, and a curriculum specialist from the local school district. 20 U.S.C. § 1414(d)(1)(B). After consulting with the parents, the district must implement an IEP. 20 U.S.C. §§ 1412(a), 1414 (d). "An IEP consists of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a

timetable for reaching the goals by way of the services." *Holmes v. Millcreek Twp. Sch. Dist.,* 205 F.3d 583, 589 (3d Cir.2000). The IEP must provide a "basic floor of opportunity" and not necessarily the "optimal level of services." *Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 533-34 (3d Cir. 1995). But an IEP that merely provides "more than a trivial benefit" is not sufficient. *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999). Instead, it must provide a plan reasonably calculated to confer "significant learning" and "meaningful benefit." *Id.* In deciding whether the district has offered the opportunity for meaningful benefit, "adequate consideration" must be given to the intellectual potential of the individual student to determine if he is receiving a FAPE, requiring a "student-by-student analysis that carefully considers the student's individual abilities." *Id*. at 248.

To the greatest extent possible, there is a strong preference for placing the special education student within the general education population, providing aids and services without removing them from their neighborhood school. 20 U.S.C. §1412(a)(5)(A). This requirement is called "mainstreaming" and is part of the district's obligation to offer an education in the "least restrictive environment." *D.S. v. Bayonne Bd. of Educ.,* 602 F.3d 553, 556-57 (3d Cir. 2010). In determining whether the student has been sufficiently integrated in a mainstream environment, courts apply a two-part test: first, "whether the child can be educated in a regular classroom with supplementary aids and services;" and second, "whether the school has mainstreamed to the maximum extent appropriate." *Oberti v. Bd. of Educ. of Clementon Sch. Dist.*, 995 F.2d 1204, 1215-16 (3d Cir. 1993).

Parents who are not satisfied with the placement or services that the district is offering may challenge the IEP through a due process petition, presenting their arguments at an administrative hearing before an ALJ. 20 U.S.C. §1415(b)(6), (k). Once a hearing officer

determines that the district failed to provide the student an appropriate education, the parents may seek several different remedies based on the circumstances. If the district denied the student the services he required while attending public school, the ALJ may order additional services be provided prospectively and that the district be ordered to provide compensatory educational services to make up for the earlier deprivation. *See N.E.*, 172 F.3d at 249. If the parents provided private therapy, the district may be ordered to reimburse plaintiffs for the cost of necessary therapy by qualified personnel. *See Bucks Cnty. Dept. of Mental Health/Mental Retardation v. Pennsylvania,* 379 F.3d 61, 67 (3d Cir. 2004). Parents who withdrew their child from public school because the district failed to offer a FAPE and then placed their child in an appropriate private school may be reimbursed for the cost of the child's private education and related expenses. *Ramsey Bd. of Educ.,* 435 F.3d 384, 389-90 (3d Cir. 2006); *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993).

## V. DISCUSSION

The issues properly before the court are: (a) whether the ALJ correctly determined that Plaintiffs were not entitled to reimbursement for tuition and related services at Temple Beth El during the 2010-2011 school year; and (b) whether the ALJ erred in denying reimbursement for the student's personal hearing aid.

### (a) Reimbursement for Private School and Related Services

Plaintiffs rejected the Board's decision to place G.A. in the integrated Roberge program for the 2010-2011 year and, instead, enrolled him in a private school, Temple Beth El. They also began private therapy. They claim that the Board's IEP did not offer G.A. a free and appropriate

public education.  Consequently, they request compensation for the cost of his private school tuition and private therapy.  The IDEA permits plaintiffs to recover the cost of an appropriate private education and related expenses if the public school refused to provide the student a FAPE.  *L.E. v. Ramsey Bd. of Educ.,* 435 F.3d 384, 389 (3d Cir. 2006); *Carter*, 510 U.S. at 15.  But "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk."  *Sch. Comm. of Burlington v. Dept. of Educ. of Mass.*, 471 U.S. 359, 373-74 (1985).  To recover expenses Plaintiffs must show both: (1) that the district failed to provide a free and appropriate education in the least restrictive environment, and (2) that the parents' private placement was appropriate.  *See T.R. v. Kingwood Twp. Bd. of Educ.,* 205 F.3d 572, 582 (3d Cir. 2000).  Regarding to the first issue, whether the Board failed to provide an appropriate placement, the Third Circuit has stated a two-part test: "(1) Has the school district complied with the procedures set forth in the IDEA?; and (2) Has the school district fulfilled its obligation to provide the student with a FAPE?" *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66 (3d Cir. 2010).  Plaintiffs assert that the Board violated procedures and that the Board's IEP substantively deprived G.A. of a FAPE.

*(1) Alleged Procedural Violations*

Identifying a technical violation of the procedures is not sufficient for Plaintiffs to obtain relief.  Instead, a "procedural violation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits."  *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 274 (3d Cir. 2012) (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 565 (3d Cir. 2010)). The Third

Circuit has found that "plaintiff bears the burden of establishing the harm caused by the claimed procedural shortcomings."  *C.M. v. Bd. of Educ. of Union Cnty. Reg'l High Sch. Dist.*, 128 F. App'x 876, 881 (3d Cir. 2005).  Absent substantive harm, plaintiffs "alleging only that a school district has failed to comply with a procedural requirement of the IDEA, independent of any resulting deprivation of a FAPE, may only seek injunctive relief for prospective compliance." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66 (3d Cir. 2010).

Plaintiffs allege that the following procedural violations deprived G.A. of an appropriate placement, contending that the District:  (A) delayed in convening the IEP meeting and delivering a proposed IEP; (B) improperly evaluated G.A. by failing to conduct sufficient testing; (C) assembled a CST without including a hearing specialist; (D) convened the IEP meeting without the statutorily required participants; (E) predetermined G.A.'s placement; (F) denied Plaintiff L.A an opportunity to observe the proposed classroom; (G) failed to observe G.A.'s prior placement soon enough; (H) denied G.A. an interim placement at Roberge; and (I) failed to conduct an occupational therapy evaluation.[9]

(A)  Delay

Although the ALJ found that the Board delayed 54-days in implementing the IEP, the Judge appears to have referred to the wrong statutory start date.  Instead, the Board was late one day in March and fifteen days in July.  Since the school year did not start until September, G.A.'s services were not substantively affected by the sixteen-day delay.

---

[9] Plaintiffs submitted a brief in support of their motion for partial summary judgment, a brief in opposition to Defendant's motion for summary judgment, and a brief in support of their cross-motion for summary judgment as to post-administrative hearing issues. The Court does not accept Plaintiffs' 50-page post-trial brief, which was incorporated by reference, as it violates the Court Rules on page limits. In their summary judgment briefs, Plaintiffs had ample opportunity to set forth each of their arguments, and did so in voluminous detail.  Their additional arguments in the post-trial brief will not be considered.

After a district receives a referral that a student may be disabled or requires services, there are a number of requirements prescribed by a statutory timetable. Following the referral, the district's child study team (CST) must meet within 20 days to discuss evaluation, decide whether to evaluate the student within 15 days of the CST meeting, and once the child is determined to be disabled, implement an IEP within 30 days. *See M.A. v. State-Operated Sch. Dist. of Newark*, 344 F.3d 335, 339 (3d Cir. 2003) (citing N.J.A.C. § 6A:14-3.4(c) and 34 C.F.R. § 300.343(b)(2)). "From start to finish, the laws of New Jersey require implementation of an IEP for a disabled child within 90 days of initial evaluation." *M.A.*, 334 F.3d at 339.

Here, the district received a referral from L.A. on March 4, 2010. The CST met one day after the twenty-day deadline on March 25 and provided notice of its decision to evaluate G.A. on April 8. L.A. signed the parental consent to evaluate on April 11. After a number of evaluations, the IEP team held a meeting on July 16 and classified G.A. as disabled. The Board provided a proposed IEP on July 26. After the administrative hearing, the ALJ determined that 144 days elapsed between the March 4 referral and the July 26 IEP proposal, making the Board 54 days late of the 90-day deadline.[10] (OAL 51).

The ALJ's statutory interpretation is reviewed de novo. Here, the parties' dispute whether the 90-day clock began when L.A. referred G.A. to the Board on March 4 or when the Board received parental consent to evaluate after April 11. The statute states: "After parental consent for initial evaluation of a preschool age or school age student has been received, the . . . implementation of the IEP for the student shall be completed within 90 calendar days." N.J.A.C.

---

[10]  The ALJ excused the District's delay finding both parties at fault. The opinion states that the parents were 110 days late in providing notice to the district, as the statute requires referral 120 days before the child's third birthday. The ALJ cited N.J.A.C. 6A:14-3.3 for the 120 day requirement, but Plaintiffs argue it is a District obligation, not a parental obligation. The Court does not address this issue because, regardless, the Board's delay did not cause substantive harm.

6A:14-3.4(e).  Thus, the statute explicitly starts the 90-day timeframe upon parental consent, not referral.  Plaintiffs have not cited any authority indicating otherwise.  Instead, they argue that L.A.'s March 4, 2010, letter informing the district of G.A.'s impairment and requesting assessment operated as implicit consent to conduct any evaluations the district determined necessary, without delay.  Plaintiffs claim that there was no dispute that G.A. required evaluation, and according to the Code "[i]f initial evaluation of a preschool age child is warranted, the district board of education shall take steps to ensure that consent to evaluate is obtained without delay."  N.J.A.C. § 6A:14-3.4(e)(3).

Treating L.A.'s referral as consent to evaluate is prohibited by the Code, which mandates that: "(a) Consent shall be obtained:  1. Prior to conducting any assessment as part of an initial evaluation."  N.J.A.C. § 6A:14-2.3(a) (1).  The initial evaluation is the set of comprehensive tests given to a student after referral.  *See* N.J.A.C. 6A:14-2.5.  The statute requires not just consent to initial evaluation, but also "any assessment as part of an initial evaluation."  Thus, general consent to the initial evaluation is not sufficient.  Rather, there must be consent to each component of the initial evaluation before conducting testing.

The statute provides that the district may hold such a meeting within twenty days of referral when one "is required to make the determination and respond to the parental request …."  N.J.A.C. § 6A:14-2.3(h)(5)(i).  Thus, after the Board received L.A.'s March 4 notice, the CST had twenty days to hold the Nature and Scope meeting and determine the extent of assessments the Board would order for G.A.  While it may have been undisputed that G.A. had hearing loss, the Board had not yet met to determine the types of assessments he required.  After the March 25 meeting, having decided which assessments to conduct, but before beginning evaluation, the Board sent a Parental Notice of Proposed Initial Evaluation listing five assessments and

requesting consent for each.  (OAL 5).  This step, of receiving consent for "any assessment," was required.  Thus, the Board could not have begun each particular assessment as part of the initial evaluation based on L.A.'s March 4 referral.

Furthermore, there was no delay in the CST sending the proposed evaluation consent form two-weeks after the March 25 meeting, as the statute provides fifteen days. N.J.A.C.6A,14-2.3(h)(5)(i).  Consequently, the proper start of the 90-day timeframe was after the CST received consent, which L.A. signed on Sunday April 11, 2010.  Assuming the CST received the letter on Monday, the Board provided an initial IEP after 105 days, on July 26. Thus, the district was late by one day in its CST meeting and fifteen-days in implementing an IEP.

The Third Circuit has held that a district's failure to have an IEP in place on the first day of classes does not necessarily result in a loss of educational benefit.  *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 69 (3d Cir. 2010) ("While we do not sanction a school district's failure to provide an IEP for even a *de minimis* period, we decline to hold as a matter of law that any specific period of time without an IEP is a denial of a FAPE in the absence of specific evidence of an educational deprivation.").  Other courts have found lengthy delays in implementing an IEP actionable.  *See Tice v. Botetourt Cnty. Sch. Bd.*, 908 F.2d 1200, 1207 (4th Cir. 1990) (delay of six-months); *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764, 766-67 (6th Cir. 2001) (district never convened an IEP conference and failed to implement final IEP before start of the school year).  *Cf. Myles S. v. Montgomery Cnty. Bd. of Educ.,* 824 F. Supp. 1549, 1555 (M.D. Ala. 1993) (delay, which resulted in IEP not being implemented until the second week of school, did not deny substantial educational benefit).

Here, the Board's total delay of sixteen days resulted in a final proposed IEP by July 26, 2010, more than a month before the start of the school year.  Nothing in the IEP called for services to begin before classes resumed in September.  Because the Board's obligation to provide services at the start of the school year was not affected by this sixteen-day delay, the procedural violation is not actionable.  Having found no substantive loss of educational benefit, the Court need not consider Defendant's additional evidence indicating the delay was due to Plaintiffs' lack of cooperation in scheduling.

(B) Improper Evaluation

Plaintiffs claim that the Board did not properly evaluate G.A., failing to test him in all areas of suspected disability.  They assert "Defendant failed to conduct educational, cognitive, functional, behavioral, audiological or assistive technology evaluations."

The ALJ found that, after notice was provided on March 4, 2010, G.A.'s parents had him tested by an audiologist, an occupational therapist, and a speech and language pathologist.  The Board physical therapist and psychologist also evaluated him.  Although the Board's speech and language pathologist did not test G.A., the ALJ found that the CST offered to schedule an evaluation by the Board pathologist.  L.A. wanted results sooner, however, and scheduled a private speech and language evaluation.

The regulations provide the scope of assessment:  "The child is assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities."  34 C.F.R. § 300.304(c)(4).  The New Jersey statute adds that the evaluation must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the suspected eligibility category."  N.J.A.C. 6A:14-

2.5(b)(7). This does not appear to require districts to test a hearing disabled student for all possible disabilities, even where there is no basis to suspect impairment. *See, e.g., P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 738-39 (3d Cir. 2009) (applying federal law).

Plaintiffs cite the Ninth Circuit case *N.B. v. Hellgate Elementary Sch. Dist.,* for the proposition that failure to test areas of suspected disability denies a student a FAPE. 541 F.3d 1202, 1209 (9th Cir. 2008). There, the Board suspected the child had autism, suggested autism testing to the parents, but then failed to conduct an evaluation. *Id.* Here, G.A.'s evaluations indicated he was suffering from hearing loss and speech delay, not, as Defendant noted, cognitive impairment. The Board was required to have G.A. tested for speech and language therapy and audiological evaluations based on reports the CST received. Additionally, given that when G.A. was three months old he suffered from "asymmetry of movement, mild gross motor deficits and mild right torticollis and right plagiocelphaly," there was a basis to require a physical therapy evaluation. But after several private evaluations and the Board's psychological and physical therapy evaluation, there were no indications at the time the IEP was created that G.A. suffered from another type of disorder. Although at the administrative hearing, months later, G.A.'s occupational therapist testified that he may have dyspraxia, that information was not available to the CST when it created the IEP. The 2010-11 CST had no basis to suspect behavioral, functioning, or cognitive disabilities, and thus, no reason to test in those categories.

As to Plaintiffs' claim that the Board failed to conduct its own audiological testing, the CST incorporated the results of the parents' private audiological evaluation. The Board is not liable for providing an improper evaluation where it accepts the results of private evaluations in lieu of district testing. *See Pitchford v. Salem-Keizer Sch. Dist. No. 24J,* 155 F. Supp. 2d 1213, 1233 (D. Or. 2001) ("[The code] requires only that the child "is assessed," not that the school

district itself perform the assessment."); *J.S. v. Shoreline Sch. Dist.*, 220 F. Supp. 2d 1175, 1186 (W.D. Wash. 2002) (The IDEA does not require the district separately to assess a student, "it was imminently reasonable to rely on the child's own psychiatrist for a diagnosis.").

(C) Lack of Hearing Specialist on Child Study Team

Plaintiffs claim that G.A. was denied appropriate services because none of the Board's evaluators were familiar with hearing impairment. The Code requires that "A minimum of one evaluator shall be knowledgeable in the area of the suspected disability." N.J.A.C. 6A:14-2.5(b)(6). Here, G.A. was suspected of suffering from hearing loss and speech delay. Carol Beierle, a member of the CST, was familiar with those areas of disability. Before becoming a learning disabilities teacher consultant, she practiced as a speech language pathologist for eighteen years. She had her Master's degree in speech language pathology and was certified as a pathologist. At least one evaluator, Kimberly Auerbach, specialized in hearing loss. Although a private evaluator, she provided her report to the CST, which made determinations based on her findings. As such, the Board met this provision.

(D) IEP Meeting Participants

Plaintiffs assert that additional individuals should have attended the IEP meeting. They claim that G.A. was denied a substantive educational benefit because the IEP meeting lacked: (i) both a general and a special education teacher; (ii) an instructor who had personally taught G.A.; (iii) an expert in hearing implants; (iv) an audiologist; (v) an individual who personally evaluated G.A.; (vi) a physical therapist to interpret coding on the evaluation; (vii) the Board's psychologist to interpret her evaluation; and (viii) a general education teacher that participated in developing the IEP.

By administrative regulation, the IEP meeting must include certain individuals, at a minimum: the parent, one general education teacher and one special education teacher knowledgeable about the district's programs, one child study team member, the case manager, and a representative for the district. N.J.A.C. 6a:14-2.3(k)(2); 34 C.F.R. § 300.321(a). The ALJ noted that only three people attended G.A.'s IEP meeting: L.A., Carol Beierle, and Lisa Dalto. Dalto signed the IEP meeting participants' sheet as both general education and special education teacher, and Beierle signed as case manager and District representative. As to whether the IEP meeting had the statutorily required individuals, Defendant argues that the two Board employees held multiple roles. Dalto was a district teacher at the Roberge School who had certifications in both general education and special education. Carol Beierle was G.A.'s case manager, a member of the CST, and a District representative.

The federal regulations provide some indication of which individuals may combine roles. The regulations list five individuals who are required to attend the IEP meeting: a parent, a special education teacher, a general education teacher, a representative from the district, and an individual who can interpret results. 34 C.F.R. § 300.321(a). Regarding the fifth role, the individual able to interpret evaluation results, the regulation permits that this person "may be a member of the team described in paragraphs (a)(2) through (a)(6) of this section." *Id.* In other words, an IEP Team meeting is proper even if the district representative has a dual role as the individual interpreting evaluation results. Permission to combine roles is not explicitly provided for any other roles.

Courts construe statutes and regulations so that "effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error." *United States*

*v. Higgins*, 128 F.3d 138, 142 (3d Cir. 1997). Here, the provision permits a district representative to act dually as the evaluation interpreter. Permission to combine those specific roles would be rendered superfluous if the regulation contemplated that any role could be combined with any another. To give effect to that provision, only the role of evaluation interpreter may be combined. Here, having only two Board employees at the July 16, 2010, meeting was a procedural violation.

For the purposes of determining whether that violation rises to a substantive level, however, there must be a loss of educational benefit. There is clear value in having a host of different educators with different viewpoints discuss a student's education with the parents, as contemplated by the regulations. But here, that Dalto played two roles, as both general and special education teacher, is insufficient to find a meaningful deprivation. Dalto was a district teacher at the Roberge School who has certifications in both general education and special education. Beierle had a lengthy list of qualifications and combined thirty-six years of experience. Between them, they sufficiently covered the core areas of expertise to substantively provide appropriate information and recommendations. Thus, it is a technical violation without substantive harm. *C.H. v. Cape Henlopen Sch. Dist.,* 606 F.3d 59, 62 (3d Cir. 2010).

As to whether the Board was required to include an instructor who had personally taught G.A., the statute provides that: "If the student has no general education teacher, a general education teacher who is knowledgeable about the district's programs shall participate." N.J.A.C. 6a:14-2.3(k)(2)(ii)(1). As of 2010, no Board teacher had instructed G.A. Thus, the Board was only required to provide a teacher knowledgeable about the programs. As a teacher certified in both general and special education, Dalto met that requirement.

As to whether an individual who personally evaluated G.A. should have been present, that is not required by statute and Plaintiffs have not provided any authority to the contrary. In addition, regarding the presence of subject experts at the IEP meeting, the Third Circuit has ruled that the statute provides "a list of those individuals who must participate in designing an IEP; an expert on the child's specific disability is not required." *Rodrigues v. Fort Lee Bd. of Educ.*, 458 F. App'x 124, 127 (3d Cir. 2011).

As to whether the psychologist or the physical therapist was required to attend the meeting to explain the reports, federal regulations provide that the IEP team must include: "An individual who can interpret the instructional implications of evaluation results …." 34 C.F.R. § 300.321(a)(5). Plaintiffs contend that there were physical therapy codes contained in the physical therapy evaluation report that no members of the IEP team were able to explain. Defendant argues that the implications of the evaluations were explained in the draft IEP.

The CST report did contain an explanation of the physical therapy test results:

Results of the Physical Therapy Evaluation by Kellie Baldwin indicate that G.'s muscle strength and tone are in the low/normal range, range of motion is within normal limits throughout his trunk and extremities, with slightly pronated feet bilaterally, and that G.'s functioning at the 30-36 month level gross motor wise with some scatters into higher level skills.

Areas of concern were reported as delays in gross motor development especially with activities that require weight shifting to one side and movements against gravity such as; standing on one foot, hopping and stair climbing. Also, lack of control of movements, impulsive and requires frequent redirecting to remain on task, were noted concerns.

(Def.'s Mot. for Summ. J. Ex. L, ECF No. 104-2 at 86).

Defendant notes that Carol Beierle, as a Learning Disabilities Teacher Consultant of eighteen years, was able to interpret that summary. Additionally, the testimony in the administrative record indicates that Ms. Beierle discussed the results of the evaluation with L.A.

and that she noted the parent's concerns. L.A. accepted the CST's recommendation that G.A. receive physical therapy and the discussion moved onto the next topic. Similarly, L.A. testified that Ms. Beierle walked her through the IEP, including the physical therapy evaluation, and handwrote the terms into the draft. Plaintiff has not cited, and the Court has not found, any testimony in the record that L.A. had questions about physical therapy coding at the IEP meeting, which went unanswered, leaving her without an understanding of the physical therapy evaluation.

Finally, Plaintiffs allege that Ms. Dalto did not play an active role in developing G.A.'s IEP, rendering it invalid. The Code requires that the "general education teacher as a member of the IEP team must, to the extent appropriate, participate in the development, review, and revision of the student's IEP." N.J.A.C. 6A:14-2.3(k)(ii)(2). Plaintiffs' additional evidence includes Lisa Dalto's deposition, where she testified that she had not seen the IEP before the July 16, 2010, IEP meeting and never read the IEP after. Although she could not remember G.A.'s case specifically, in general, she did not participate in any decision-making regarding IEPs. To her knowledge, the case manager made determinations as to services. Given that G.A. had never attended a public school class as of July 2010, neither Ms. Dalto, nor Ms. Benecaso, the Board's proposed teacher for G.A., had ever taught G.A. as a student. As such, the extent of contribution by the general education teacher was appropriately limited. This is one reason the statute permits any general education teacher with knowledge of the Board's programs to attend the IEP meeting when the student has no general education teacher. N.J.A.C. 6a:14-2.3(k)(2)(ii)(1). Here, G.A. had no general education teacher because he had not yet attended public school. Thus, Dalto's involvement was appropriate under the Code.

(E) Predetermined Placement Decision

A district violates the IDEA when it presents parents with a predetermined IEP, that is, an IEP where the services and placement have already been conclusively decided without parental input. *See D.B. v. Gloucester Twp. Sch. Dist.*, 751 F. Supp. 2d 764, 771 (D.N.J. 2010); 34 C.F.R. § 300.513(a)(2)(ii). A predetermined IEP is actionable because it seriously deprives parents of their participation rights, "exclud[ing] parents from meaningfully participating in the decision making process." *D.B.*, 751 F. Supp. 2d at 771. Plaintiffs assert that the Board provided a predetermined IEP at the July 16, 2010, IEP meeting. They claim that the CST developed G.A.'s IEP around their predetermined placement at the Roberge School and refused to consider other placement options. This, they allege, substantively denied G.A. an appropriate placement, entitling Plaintiffs to tuition reimbursement.

In deciding that the IEP was not predetermined, the ALJ considered the extent that the CST tailored the IEP to fit G.A.'s unique needs, incorporating the private speech and language therapist's February and May reports, including speech and language strategies and exercises geared toward G.A.'s auditory processing, articulation, and oral motor needs. As to placement, the ALJ noted that Carol Beierle observed G.A. at his private school, and the IEP incorporated consideration of whether Temple Beth El was appropriate based on Beierle's visit on June 7, 2010. Judge Kirk credited Carol Beierle's testimony that the IEP team considered L.A.'s concerns and discussed placement at Temple Beth El. She noted these concerns in the proposed IEP of July 26, 2010, listing each of L.A.'s objections. Judge Kirk specifically relied on the IEP team's decision to accept Plaintiffs' suggestion to change G.A.'s placement as proof that the decision was not predetermined. Originally, the CST recommended the Roberge self-contained program for G.A. This was because the Board did not operate a general education preschool class, and the only program for three-year old special education children was the self-contained

program. At the IEP meeting, L.A. expressed her concern that the self-contained program was scheduled at the same time as the Temple Beth El morning program, and she wanted G.A. to attend both. The IEP team accepted this recommendation and changed G.A.'s placement to the integrated program in the afternoon, permitting him to attend Beth El in the morning. The CST also noted L.A.'s concern regarding mid-day transportation. As such, the ALJ found that the IEP placement reflected L.A.'s concerns, incorporated some of her recommendations, and was not predetermined.

In support of their position, Plaintiffs submitted additional evidence on this issue, including Lisa Dalto's deposition testimony. Ms. Dalto attended the July 16, 2010, IEP meeting to answer questions about the Board's general and special education programs. Although Dalto could not remember the meeting, (Dalto Dep. 18:2-3, ECF No. 106-3), she stated that, to her knowledge, "the Child Study Team makes all determinations" regarding placement, (Dalto Dep. 20:1-4). Plaintiffs contend that these determinations were made and presented in a draft IEP before L.A. had an opportunity to provide input.

That a district comes to the IEP meeting with a completed draft document, before consulting with the parents, does not render an IEP predetermined. *See B.G. v. Cranford Bd. of Educ.*, 702 F. Supp. 1158, 1166 (D.N.J. 1988) (quoting *Scituate Sch. Comm. v. Robert B*., 620 F. Supp. 1224, 1230-31 (D.R.I. 1985) (finding a completed IEP, which was presented at the IEP conference, was permissible because its terms were not immutable or unchangeable), aff'd 795 F.2d 77 (1st Cir. 1986) (mem.)). As long as there is an opportunity for parental input, a draft IEP is permissible. *See Hampton Sch. Dist. v. Dobrowolski,* 976 F.2d 48, 54 (1st Cir. 1992); *Blackmon v. Springfield R-XII Sch. Dist.,* 198 F.3d 648, 657 (8th Cir. 1999). Where the parents are denied substantive input, however, there is a violation, such as where the district fails to

incorporate any of the parents' suggestions or listen to their concerns. *D.B.,* 751 F. Supp. 2d at 772.

In *Fuhrman,* the district made placement decisions and created a draft IEP without consulting with the parents. *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1036 (3d Cir. 1993). At the IEP meeting, however, the district discussed the IEP with the parents and noted their suggestions. *Id.* The Third Circuit found that that this was "clearly more than after the fact involvement," such that the parents had an opportunity to participate in the IEP process in a meaningful way. *Id.* Similarly, a school district is not liable for failing to accept parents' recommendations. *L.G. v. Fair Lawn Bd. of Educ.*, No. 2:09-cv-6456, 2011 WL 2559547, *4 (D.N.J. June 27, 2011) (Cavanaugh, J.). The district need only listen to their concerns and permit parental involvement in the development of their child's education. *Id.* "If the standard for measuring meaningful parental participation was that the parents always prevailed, there would be no process at all." *Id.*, at *5.

Considering the administrative record and the additional evidence, the preponderance of the evidence supports the ALJ's conclusion that the Board's placement decision was not predetermined. As Ms. Dalto testified, the Child Study Team may have made preliminary determinations regarding G.A.'s placement for the draft IEP. But ultimately, the team did in fact consider L.A.'s concerns, did in fact evaluate the appropriateness of Temple Beth El, and did in fact document L.A's recommendations. As a result of this conversation, the IEP team changed its placement determination based on her concerns. Consequently, the IEP placement decision reflected plaintiff's input, even if the final result was not one that fully satisfied Plaintiffs.

(F) Observation of Roberge

Plaintiffs allege a violation of parental participation rights because L.A. was not permitted to observe the Roberge integrated program before the start of the 2010-11 school year. The Code states that the Board "shall provide the parent with the opportunity to observe the proposed educational placement … prior to implementation of the IEP." N.J.A.C. 6A:14-4.1(k). The ALJ did not address this issue.

In its briefing, the Board relies on an educational policy, which states that parental observation of a proposed program is permitted after the child is classified as disabled. G.A. was not deemed eligible until his classification conference on July 16, 2010, after the summer recess began. Classes were not held at Roberge during the break, which started June 23. Regardless of the Board's policy, the CST was still conducting evaluations of G.A. as late as July 1, more than a week after Roberge stopped holding classes. For L.A. to have observed the Roberge program before the summer recess, the Board would have had to propose the Roberge integrated program before both receiving G.A.'s psychological evaluation and deeming him eligible as preschool disabled. Since the CST did not propose Roberge Integrated until after the July 16 IEP meeting, parental observation was not possible before the end of classes under these circumstances.

A district is not required to create a preschool program for a disabled student where the district does not normally operate one. *T.R. Kingwood Twp. Bd. of Educ.,* 205 F.3d 572, 579-80 (3d Cir. 2000). It follows that the Board was not required to hold special sessions of the Roberge program during the summer to permit L.A. to observe the program. When the opportunity was available, after the summer break, L.A. observed the Roberge program several times.

Plaintiffs also allege that they were not invited to a "meet and greet" with the Roberge teachers in "late August or early September." Plaintiffs do not point to a Code section entitling them to a right to meet the child's specific teachers. And as Defendant notes, Plaintiffs had

already enrolled G.A. at Temple Beth El by this time. Either way, L.A. met with Lisa Dalto, a Board teacher familiar with the available special and general education programs, at the IEP conference. Ms. Dalto was present to discuss any questions or issues related to the special and general education programs at the Roberge School. That L.A. spoke with Dalto, rather than the teacher who would be present personally in G.A.'s classroom during the school year, does not rise to the level of a serious deprivation of meaningful parental participation.

(G) Observation of Temple Beth El

Plaintiffs claim that Defendant "knowingly and deliberately engaged in a pattern of delay" after L.A. requested that the Board observe G.A. in his regular preschool classroom at Temple Beth El. Plaintiffs submitted additional evidence, including emails from the board expressing doubts that, given the time constraints, the CST would be able to evaluate G.A. at Beth El. In effect, Plaintiffs claim that the CST delayed such that they were almost unable to observe G.A. at Beth El. Regardless, the Board did observe G.A. at Beth El. The CST did so within the 90-day timeline specified by the statute, on June 8, 2010, before making any decision regarding placement. Thus, there is no violation.

(H) Interim Placement

Plaintiffs assert that under the "stay put" provision of the IDEA, the Board should have permitted G.A. to attend Roberge as an interim placement until the administrative proceedings concluded. The IDEA states that "during the pendency of any proceedings conducted pursuant to this section … if applying for initial admission to public school, [the student] shall, with consent of the parents, be placed in the public school program until all such proceedings have been completed." 20 U.S.C. § 1415(j). The statute specifically requires parental consent to

place the student in a new program.  Here, however, the record reflects that G.A.'s parents did not consent to an interim placement at Roberge.  The ALJ found that, by the start of the 2010-11 school year, Plaintiffs had enrolled G.A. at Temple Beth El and had been billed for the tuition by June 2, 2010.[11]  In their supplemental statement of non-disputed material facts, Plaintiffs admit that even after the ALJ's decision, they sought related services at Roberge from the Board, but that they refused to consent to G.A.'s enrollment in the integrated program.  This supports the ALJ's finding that Plaintiffs refused to sign the consent form to permit placement at Roberge. Since the statute requires consent, and Plaintiffs refused to provide consent to placement, there is no interim placement violation.

(I)  Occupational Therapy Evaluation

Plaintiffs allege that the Board failed to suggest an occupational therapy evaluation in the initial assessment and, when Plaintiff L.A. requested an evaluation, the CST failed to respond. With respect to Defendant's purported failure to suggest an occupational therapy evaluation before L.A. requested one, the Board did list "occupational therapy" in the April 8, 2010, Parental Notice of Initial Evaluation, but when Plaintiffs returned the form, the box for occupational therapy was not checked.  As to the Board's purported failure to conduct an evaluation after L.A. requested one, the ALJ excused this violation because the Board was not provided sufficient time to conduct the evaluation between when L.A. sent the request, dated July 21, 2010, and when the due process hearing was filed on August 2.  The ALJ's interpretation of the Code is reviewed de novo.

---

[11]  The ALJ found that Plaintiffs paid tuition on June 2; however, Plaintiffs point to receipts that indicate they were billed for G.A.'s full-year tuition, but made partial payments throughout the year.  Regardless, it represents a commitment to send G.A. to Beth El before the start of the school year.

Arguing that the ALJ applied the wrong regulation, Plaintiffs assert that the Board had only ten days to decide whether to conduct the evaluation pursuant to N.J.A.C. 6A:14-2.5(c)(1). Defendant, argues that the ALJ used the correct provision, N.J.A.C. 6A:14-2.3(h)(5), which provides twenty days to determine whether to conduct an evaluation.

The first statute, N.J.A.C. 6A:14-2.5(c), governs when parents may request independent evaluations after the parents and district disagree. Subsection 1 states: "If a parent seeks an independent evaluation in an area not assessed as part of an initial evaluation or reevaluation, the school district shall first have the opportunity to conduct the requested evaluation." *Id.* The district has ten days to determine whether to conduct the requested evaluation and provide notice to the parents. *See id.* If it chooses to conduct the evaluation, it must do so within 45 days.

The statute Defendant cites governs parental notice: N.J.A.C. 6A:14-2.3(h)(5). It states, "Upon receipt of any written parental request to initiate or change the referral, identification, classification, evaluation, educational placement or the provision of a free, appropriate public education" the district must provide written notice within twenty days. If the district requires a meeting to determine how to respond, they may meet within the twenty days and then provide their determination to the parents within fifteen days of the meeting. N.J.A.C. 6A:14-2.3(h)(5)(i). This governs the timetable when parents request that the Board initiate evaluation.

Here, L.A.'s July 21, 2010, letter was not to request an initial evaluation, but to request a specific assessment that the Board did not conduct during the first round of evaluations. Specifically, in her July 21, 2010 letter, L.A. asked for an occupational therapy evaluation and recommended an independent evaluator, Chaye Warburg. Thus, it falls under the statute Plaintiffs cite, giving Defendant an opportunity to conduct the requested independent evaluation first. It is rational that when a parent refers their child, for the first time, to the district to perform

an initial evaluation, the board has more time, twenty days, to determine the scope of evaluation. N.J.A.C. 6A:14-2.3(h)(5)(i). On the other hand, if during the district's initial evaluation, a parent requests an additional assessment that the district did not conduct, they have only ten days to make a determination of whether to conduct it. Consequently, the Board had ten days after July 21 to provide notice of its decision, which it did not do. Since the Board agreed that G.A. required an occupational evaluation, but failed to provide notice as required under the procedures, it shall reimburse Plaintiffs for the private evaluation by Chaye Lamm Warburg, which took place on October 25, 2010, October 28, 2010, and November 1, 2010.

(I) Remaining Procedural Issues

Plaintiffs listed several other procedural issues in their motions including: (i) failure to provide L.A. evaluation reports with sufficient time before the IEP meeting; (ii) failure to explain why the services recommended by G.A.'s evaluators were not included in the IEP; (iii) failure to address the lack of daily living skills in the IEP; (iv) failure to consider G.A.'s unique needs; (v) insufficient IEP goals; and (vi) failure to follow state evaluation procedures.

As to the Board's alleged failure to provide reports ten days before the meeting, there was testimony that L.A. was provided the reports in advance of the meeting and read them the morning of the IEP meeting. Where a violation of a "notification requirement does not actually impair the parents' knowledge of, or participation in, educational decisions, the violation is not a substantive harm under the IDEA." *C.H. v. Cape Henlopen Sch. Dist.,* 606 F.3d 59, 70 (3d Cir. 2010) (citing *Gadsby v. Grasmick,* 109 F.3d 940, 956 (4th Cir.1997) ("Because any violation of the notice provisions did not interfere with the provision of a free appropriate public education to [the child], these violations cannot subject [the district] to liability for reimbursement of [private school] tuition.")).

The record does not support plaintiffs claim that the Board failed to explain the differences in the services recommended, consider G.A.'s unique needs, or justify the goals listed in the IEP.  To the contrary, the record contains voluminous emails, letters, and testimony as to phone calls between the Board and L.A. discussing G.A.'s needs, goals, and services.  (*See, e.g.,* OAL 19-20; Tr. 193, December 13, 2010; Tr. 189:1- 190:14, January 18, 2011).  As to the Board's purported failure to address daily living skills, identified in Beth Bargetzi's report, Ms. Warburg, the occupational therapist, testified credibly that daily living skills are improved through occupational therapy and are not necessarily in a separate category.

The Board appears to have followed the state evaluation procedures in N.J.A.C. 6A:14-2.5.  In other cases, an IEP has been held insufficient where the Board relied upon observation alone, without validated tests, in developing a plan for a hearing impaired student.  *Bonadonna v. Cooperman*, 619 F. Supp. 401, 409-10 (D.N.J. 1985).  Here, however, the CST used a variety of evaluation techniques and standardized tests, each analyzed by the ALJ.


*(2) Substantive Issues*

In addition to procedural violations, the Third Circuit also instructs district courts to determine whether the Board fulfilled its obligation of providing a substantive FAPE. *See C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66 (3d Cir. 2010).  Plaintiffs assert that G.A. was deprived a FAPE because the IEP ordered substantively inappropriate services.  The Individualized Education Program is the "central vehicle" for the collaborative process between parents and schools.  *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 21012).  "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school

will provide." *Id.* (quoting *Schaffer v. Weast*, 546 U.S. 49, 53 (2005)). "At a minimum, the IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities." *M.R.,* 680 F.3d at 269 (internal citations omitted).

Plaintiffs allege the following substantive deprivations of services in the Board's proposed IEP: (A) that it did not provide sufficient speech and language services; (B) that it failed to provide for extended school year (ESY) services; (C) that it did not provide for additional audiological services; (D) that it did not provide occupational therapy, and that the ALJ's decision to require occupational therapy renders the IEP inappropriate; and (E) that the Board's placement at Roberge was inappropriate.

"The issue of whether an IEP is appropriate is a question of fact." *P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009). Thus, the ALJ's conclusions as to whether a district's IEP is reasonably calculated to provide meaningful educational benefit is entitled to "due weight." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 568 (3d Cir. 2010).

(A)  Speech and Language Therapy

The Board's IEP offered speech and language therapy services that differed somewhat from private speech and language therapist Weksler's recommendations, which called for therapy sessions three times per week in groups of less than five students. The IEP provides for two therapy sessions per week and does not state a limit to the group size.

The ALJ examined each test Weksler conducted and found that, on every evaluation, G.A.'s speech and language skills were in the average range. She credited Board audiologist Maria Rohsler's testimony that certain speech articulation errors are common to three year-olds and are not necessarily a red flag. Ms. Rohsler further testified that she was comfortable that

therapy twice per week would be sufficient for G.A. because his scores were in the average range.  The ALJ concluded that:  Weksler, when she recommended three days of therapy per week, was unaware of whether G.A.'s difficulties were because of auditory processing issues or because of hearing loss; that, in light of the fact that his articulation errors were within the normal range, some of his difficulties appeared to be from hearing loss, which was separately addressed, and which, once ameliorated, would have reduced the need for frequent speech language therapy.  The record supports the ALJ's determination as to the frequency of G.A.'s speech language therapy. G.A.'s speech fell within the average range and therapy twice per week would have provided G.A. the opportunity for meaningful benefit.

As to the size of the therapy session, the ALJ credited Maria Rohsler's testimony that group therapy stimulates children to learn by example and encourage each other through healthy competition.  Although the IEP did not specify group size in the space provided, the ALJ found based on Rohsler's testimony, that the group would have been G.A. and one other student.

Plaintiffs assert that the Court must limit its consideration to the terms of the IEP itself in determining whether it provided a FAPE.  Other circuits have found that under "usual circumstances, the court should find it unnecessary to go beyond the four corners of the document in order to make that determination."  *John M. v. Board of Educ. of Evanston Tp. High Sch. Dist. 202*, 502 F.3d 708, 715-16 (7th Cir. 2007); *see also A.K. v. Alexandria Sch. Bd.,* 484 F.3d 672 (4th Cir. 2007).  Nevertheless, if the IEP is vague about how a goal shall be achieved, the court may examine extrinsic evidence to determine the intent of those who formulated the program.  *John M.*, 502 F.3d 715-16; *Doe v. Defendant I,* 898 F.2d 1186, 1190 (6th Cir. 1990) (noting that it would "exalt form over substance" to ignore information known to parents and administrators simply because it was not contained in the "four corners of the IEP").  Here, Ms.

Beierle testified that the IEP was drafted with the understanding that speech language therapy would be in a small group, usually only two students. She communicated the size of that group to L.A. at the IEP meeting. Although the IEP did not specifically state the size of group therapy, the testimony supports the ALJ's determination that the parties understood at the time the IEP was formulated that the size of group speech and language therapy would be about two students and in fact they are that small in actual size.[12]

(B) Extended School Year Services

Extended School Year ("ESY") services provide classes beyond the normal school year and are considered a special education related service. 34 C.F.R. § 300.106(b). If extended year services are necessary to provide a child with a FAPE, then it must be included in the IEP. 34 C.F.R. § 300.106(a)(2). It is necessary when the benefits the disabled child has gained during the regular year "will be significantly jeopardized if [the child] is not provided with an educational program during the summer months." *See N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1211 (9th Cir. 2008) (citing *MM v. Sch. Dist. of Greenville Cnty.* 303 F.3d 523, 537-38 (4th Cir. 2002)). Here, the ALJ found that extended school year services were unnecessary. In reaching that conclusion, she relied on the testimony of Carol Beierle. Judge Kirk noted that G.A. showed "great improvement" based on the evaluations of his teachers, he showed no regression, and Beierle's observations indicated his progress without ESY.

Plaintiffs rely on a Tenth Circuit case to assert that the ALJ's ruling is improper because she relied upon regression and recoupment. The case found that regression and recoupment could not serve as the sole basis of denying ESY. *Johnson v. Indep. Sch. Dist. No. 4 of Bixby*

---

[12] This claim by Plaintiffs borders on the frivolous, and Plaintiffs are cautioned accordingly.

*Tulsa County, Okla.*, 921 F.2d 1022, 1027-28 (10th Cir.1990). Here, however, the ALJ explicitly relied upon several sources, including observations by the teachers, reports and evaluations, as well as regression and recoupment: "The proposed IEP reflects that the IEP team met and considered G.A.'s need for an extended academic school year, and that based on all relevant factors, including regression and recoupment, it was determined that no ESY programs or services were required." Thus, the ALJ did not rely solely upon regression and recoupment, and her findings are given due weight and are affirmed.

(C) Additional Audiological Services

Plaintiffs claim that G.A. was entitled to related audiological services. They cite the Regulations, which define audiological services as those that: "(i) Identif[y] children with hearing loss; (ii) Determin[e] the range, nature, and degree of hearing loss … (iii) Provid[e] habilitative activities, such as language Habilitation, auditory training … (v) Counse[l] … parents and teachers regarding hearing loss; and (vi) Determin[e] the child's need for group and individual amplification, selecting and fitting an appropriate aid, and evaluating the effectiveness of amplification." 34 C.F.R. § 300.34(c)(1). G.A.'s IEP, however, provided these services, including access to "numerous professionals, including general education and special education teachers, a teacher of the deaf, audiologist, behaviorist, speech and language specialist, psychologist and physical therapist." G.A.'s IEP also offered assistive technology, teachers trained in auditory techniques, teachers trained to evaluate the effectiveness of amplification units and check hearing aid functioning, along with other techniques.

(D) Occupational Therapy

Relying on a private occupational therapist that assessed G.A., Dr. Warburg, Judge Kirk concluded that G.A.'s low muscle tone, weak sense of body position, and poor motor planning

required some occupational therapy. Although Warburg had recommended therapy three times per week for 45 minutes, the ALJ noted that she was providing therapy twice per week for combined physical and occupational therapy because of the overlap between physical therapy and occupational therapy for a young child. This was intended as an interim solution until the Board had an opportunity to evaluate G.A.

Plaintiffs claim that the ALJ is only capable of either finding that the IEP is appropriate or inappropriate, not rewriting the terms. Courts have found that when a hearing officer finds the IEP appropriate, the ALJ does not have equitable authority to revise the IEP to include additional services. *See Dist. of Columbia v. Doe,* 611 F.3d 888, 897-98 (D.C. Cir. 2010).

Here, the ALJ did not usurp the local educational authority's role of creating an appropriate education because she did not directly order that G.A.'s IEP include occupational services. Instead, the ALJ explicitly crafted an interim solution: "In the interim, because it appears from the testing conducted by Warburg, albeit after a Due Process Petition was filed, that G.A. may require some occupational therapy," G.A. should receive some therapy until the District has the opportunity to test him. Plaintiffs requested an occupational evaluation on July 21, after the IEP conference. Warburg conducted a private evaluation in late October 2010. The Board eventually conducted its occupational therapy evaluation in December 2011. In the ALJ's April 14, 2011 order, she did not rewrite the terms of the IEP, but offered precautionary therapy based on facts that had arisen after the initial IEP was presented and the due process hearing began. It was a logical, fair, and sensible ruling.

(E)  Placement at Roberge

Plaintiffs also challenge the Board's proposed placement, Roberge preschool, as substantively inappropriate for G.A.  They claim: (i) the classroom contained restrictive chairs; and (ii) the classroom was not sufficiently mainstream.

(i) Rifton Chairs

Plaintiffs object to placement at Roberge as violating the least restrictive environment provision because students in the integrated classroom used a type of chair, called Rifton Chairs, in which the student's movement is limited.

Plaintiffs' additional evidence, a manual on the Compass Chair by Rifton, shows a wooden chair with a high back and arms.  It has space for a hip-belt, which can be used to provide additional support or to keep a child restrained in the chair.  The arms on either side extend downward to the base of the chair such that a child's knees cannot swing out past the chair's arms.  The product manual states that it provides lateral support and "high armrests [to] give support to a child who has poor upper trunk muscle tone."  This combination also provides "boundaries."  Board witness Carol Beierle testified that these chairs were used at Roberge for preschoolers, both general education and special education, to promote good posture and provide security.  Similarly, special education teacher Lisa Benincaso stated that the chair helps students sit upright instead of slouching.

Examining the administrative record as to whether this chair was appropriate for G.A., there was disputed testimony.  The Board argues that G.A. would benefit from a Rifton Chair, pointing to G.A.'s physical therapy evaluations, which showed that he "lacked adequate trunk strength to sustain upright sitting posture."  On the other hand, G.A.'s private occupational

therapist Chaye Lamm Warburg testified that a Rifton chair would have been inappropriate for G.A. The ALJ did not make a finding on the issue.

It was not necessary for the ALJ to make a factual finding on whether a Rifton Chair would help GA's posture and security because it was undisputed that G.A.'s IEP did not require its use; the testimony was that G.A. would not have been required to sit in one at the designated school; and testimony established that if a parent asked that their child not be placed in a Rifton Chair, the Board would arrange to use a different chair. Benincaso and Beierle both so testified, with the former stating that if she were faced with a parent's objection to the use of a Rifton Chair of chair she would "have the child sit in one of the other chairs. I would honor – I would respect their request." Other types of chairs were readily available at the Roberge classroom.

After the hearing, in a May 4, 2011, letter, L.A. objected not to G.A.'s use of the chair, but that he might "be singled out as the only child seated in a different chair." Based on the preponderance of the evidence, there is no IDEA violation as to the school's use of Rifton Chairs in the classroom.

(ii) Mainstreaming Requirement

After parents unilaterally place their child in a private school, they may recover private tuition from the school district only if they show both: (1) that the district failed to provide a free and appropriate education in the least restrictive environment ("LRE"); and (2) that the parents' private placement was appropriate. *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 582 (3d Cir. 2000). The first prong of this test requires that disabled children be placed in a regular education classroom to the "maximum extent appropriate." 20 U.S.C. 1412(a)(5); *Oberti v. Bd. of Educ. of Clementon Sch. Dist.*, 995 F.2d 1204, 1215-16 (3d Cir. 1993). This means that the

classroom must be "the least restrictive environment that will provide [the student] with a meaningful educational benefit." *S.H. v. State-Operated Sch. Dist. Of Newark*, 336 F.3d 260, 265 (3d Cir. 2003). The Third Circuit has found that hybrid preschool programs are not mainstream. *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 579-80 (3d Cir. 2000). There, the Court found that a district's integrated preschool class, with half general education and half special education students "cannot be described as a regular class," and therefore, is more restrictive than a fully mainstreamed program. *Id.* at 579. Although the district was not required to create a new general education preschool program to suit the student's needs, it did need to consider other less restrictive placements, including accredited, mainstream private schools. *Id.* at 579-80. The Circuit noted that the district's hybrid preschool program would be appropriate only if: (1) the student could not succeed in a fully mainstream program even with related aids and services; or (2) there were no other appropriate mainstream programs within a reasonable distance. *Id.* Since neither the district court nor the ALJ had conducted an analysis of which placements the school district had considered, the Circuit remanded the case. *Id.* at 580.

Here, there is a serious question as to whether the ratio of general education students to special education students renders the Roberge integrated preschool program a hybrid class under the *T.R.* analysis. If it were determined to be a hybrid program, then it would only be appropriate as an LRE in the circumstances listed above, for instance, where the school district tried to locate a fully mainstream program within a reasonable geographic distance of the child's home, but was unable to do so. The ALJ did not reach these issues, and, if they were dispositive, the Court would have remanded the case for additional fact-finding. But this is not necessary here because, in any event, Plaintiffs cannot meet the second prong of the test. Parents may only recover private school tuition if both the proposed public school fails the LRE test *and* the

parents' private placement was appropriate. *T.R.,* 205 F.3d at 582. Because the Court affirms the ALJ's finding that the parents' private school placement was inappropriate, as discussed below, the Court need not reach the LRE analysis with respect to damages. Similarly, the Court need not reach the issue with respect to prospective relief because G.A. is now in a kindergarten class, and thus the Board no longer proposes the challenged preschool integrated program. Since prospective relief is not warranted and retrospective relief is not permitted where, as here, the parents' private placement is inappropriate, it is unnecessary to decide the issue of whether the integrated preschool program was the LRE.

### *(3) Appropriateness of Temple Beth El*

The ALJ's finding that Plaintiffs' private placement at Temple Beth El was not appropriate is affirmed. Judge Kirk noted that Beth El was not equipped to handle special education students' unique needs, and was a typical private preschool. In reaching this finding, she credited the testimony of Carol Beierle, who observed the Temple Beth El classrooms and reported that it was mostly "play activities" with no academic or related services. Judge Kirk weighed this against the testimony of the Beth El nursery school director, Amy Nelson. Ms. Nelson testified that a layperson might think the program involves only play activities, but in reality the materials are carefully selected manipulatives and patterns intended to promote learning. Moreover, to prepare the teachers, Ms. Nelson had them make home visits and assigned a book on separation anxiety. Judge Kirk found that, although Temple Beth El provided resources to alleviate separation anxiety, G.A. was not diagnosed with any separation anxiety issues. The play materials may have been carefully selected for Temple Beth El students, but there was no evidence they were selected to improve hearing loss or speech delay.

Instead, other than providing the initial hearing and language screening, Temple Beth El lacked professionals and resources to address G.A.'s hearing and speech impairment in the classroom. Consequently, the ALJ ruled that the absence of "disability-specific methodologies, programs or services ... to address G.A.'s particular delays, deficits or disabilities" rendered Temple Beth El inappropriate. The ALJ's decision that the placement was inappropriate and that Temple Beth El was not reasonably calculated to provide meaningful educational benefit is entitled to "due weight." *See D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 568 (3d Cir. 2010).

When assessing a private placement, the IDEA does not hold parents to the same procedural standards as it holds the school board. *Warren G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 84 (3d Cir. 1999). Even if the private school does not meet the requirements of the IDEA or provide an IEP, it may be appropriate as long as it "provides significant learning and confers meaningful benefit …." *Lauren W. v. DeFlaminis*, 480 F.3d 259, 276 (3d Cir. 2007) (citations omitted). The parents are not limited to placements at state approved schools. *Carter,* 510 U.S. at 14.

On the issue of the appropriateness of Temple Beth El, Plaintiffs submitted one additional exhibit: the school's National Association for the Education of Young Children ("NAEYC") accreditation certificate. On the one hand, there is some evidence that G.A. improved while attending Beth El. According to Ms. Nelson, "He's acclimated. He appears comfortable. We certainly still have things that we're working on with G. … I think that he's been making progress" and that his speech has improved. G.A.'s teacher at Beth El, Ms. Barbara, concurred with that opinion. The CST documented her interview in its "Present Levels of Academic Achievement and Function Performance" report, where she stated that G.A. interacted well with his peers and that his speech greatly improved from the beginning of the term. Additionally,

G.A.'s occupational therapist, Warburg, recommended keeping G.A. at Temple Beth El because removing him from that "environment which took him an entire summer to acclimate to will set him back several months." While he was attending school, his parents provided him with private speech and language therapy. Finally, Ms. Nelson testified that the nursery school was licensed by the state, that it had a highly regarded NAEYC designation, and that the classrooms had high teacher-to-student ratio of about three teachers for every eleven students.

On the other hand, G.A. underwent numerous evaluations regarding his impairment. The evaluators and Child Study Team recommended that specific services and techniques be used for G.A. to receive an appropriate classroom education. As the ALJ found, the absence of these strategies and services at Beth El indicated that G.A. was deprived of educational benefit.

Speech and language therapist Julia Weksler's May report recommended speech and language therapy to improve oral motor deficits and an "inclusion classroom with support to help develop skills due to sensorineural hearing loss." Physical therapist Kellie Baldwin recommended "physical therapy in the school setting" and "consultation as needed to the teacher aides and other school personnel." Maria Rohsler testified that there are advantages to group therapy with school peers as it encourages healthy competition. Beth El did not provide for professional consultation and training of G.A.'s teachers, skills support to develop his particular deficits, or therapy with G.A.'s peers.

Moreover, the Child Study Team made the following recommendations for G.A.'s classroom education:

> speech and language strategies and program modifications, including those geared toward auditory processing and articulation and oral motor: provide leading questions to elicit verbal responses; use listening comprehension experiences; facilitate verbal expression; reword directions to increase understanding; use auditory comprehension exercises; use association skills; use auditory closure: tasks; provide repetition of material as needed; review material prior to activity;

preferential seating to increase attending; use auditory discrimination exercises; utilize short-term memory exercise; demonstrate placement of speech articulators; use auditory, visual, tactile and kinesthetic approaches; provide auditory discrimination activities; rehearse learned material; incorporate cued practice with usage of target sounds; provide practice experiences for spontaneous speech, utilize carry-over activities.

The CST also recommended instructing G.A.'s teachers in: the use of "auditory training techniques," to "evaluate effectiveness of amplification units … [by providing] teachers trained to check hearing aids and FM system functioning-daily;" how to "use appropriate acoustic environment;" and to "use auditory closure tasks." Finally, the team suggested G.A. be taught to "facilitate self- monitoring and self-correction; [and] emphasize multi-sensory presentation of data."

Ms. Nelson testified at length about the schedule and structure of the Beth El program. She discussed the focus on conflict resolution, confidence building, cultivating independence, and improving developmental skills. She also described the specialized separation anxiety precautions the school provided. There was no testimony, however, on specialized instruction, teacher training, or particularized strategies designed to improve the specific deficits G.A. was diagnosed with: hearing loss and speech delay.

Although a private school may be appropriate even if it does not have medical or subject specialists on site, *Moorestown Twp. Bd. of Educ. v. S.D.,* 811 F. Supp. 2d 1057, 1078 (D.N.J. 2011) (Bumb, J.), a lack of teacher training or methodologies specifically targeting the child's impairment indicates the parents' placement is inappropriate. *See Stevens v. New York City Dept. of Educ.*, No. 09-cv-5327, 2010 WL 1005165, at *9 (S.D.N.Y. March 18, 2010) (finding failure to provide specialized services or modify the general curriculum rendered parents' placement inappropriate); *J.G. v. Kiryas Joel Union Free Sch. Dist.*, 777 F. Supp. 2d 606, 656 (S.D.N.Y. 2011) (finding that, despite child's progress, his placement in a private religious

school was inappropriate because it did not have experience educating disabled children or programs designed to augment the child's therapy).  On the other hand, a private placement may be appropriate if the teachers are trained in a manner well suited to assist the student in class. *F.D. v. Holland Twp. Bd. of Educ.*, No. 05-5237, 2007 WL 2021782, at *7 (D.N.J. July 9, 2007) (Thompson, J.).

Here, Beth El's high teacher-to-student ratio and an NAEYC certificate, while helpful, are irrelevant to improving G.A.'s unique conditions.  Similarly, Beth El's focus on development and anxiety prevention may be beneficial, but does not address his specific impairments.  His diagnosis is hearing loss and speech delay, which went undetected by generalists.  Ms. Nelson had no idea G.A. had hearing loss until a specialist diagnosed it, and was unfamiliar with the type of speech condition G.A. suffered from: a shortened frenulum.[13]  Other than providing a teenage volunteer aide to help G.A. acclimate during the summer, there was no evidence that Beth El modified the general curriculum to incorporate the classroom strategies identified in G.A.'s recommendations or trained teachers regarding his condition.  That several non-specialists believed G.A. improved at Beth El does not negate the private school's failure to employ those methodologies.  At Beth El, G.A. did not have what was recommended:  trained teachers knowledgeable about his particular conditions and methodologies to support his speech and hearing development

Giving due weight to the ALJ's finding of fact, Plaintiffs have not identified evidence to support departing from Judge Kirk's conclusion that the lack of trained teachers or disability-specific methodologies at Beth El was inappropriate.  Consequently, Plaintiffs are not entitled to recover the cost of tuition and related services.

---

[13] Which is often easily corrected with minor surgery.

**(b) Reimbursement for an Ear Level Hearing Aid**

Although Plaintiffs are not entitled to tuition reimbursement, they may still be awarded reimbursement for aids or services they purchased, if those proposed in the IEP were inadequate. Plaintiffs claim they are entitled to the costs for G.A.'s ear-level hearing aid. School districts must provide assistive technology to a student where it is required to receive free and appropriate public education. 34 C.F.R. § 300.105; N.J.A.C. 6A:14-3.7(c). The Board provided a type of hearing aid, a desk-level FM aid, and asserts this is sufficient. The ALJ agreed with the Board, finding the desk level aid adequate for G.A. to have meaningful educational benefit.

Judge Kirk considered G.A.'s requirements when his IEP was created. Before the July 16, 2010, IEP meeting, Plaintiff L.A. and the Board's CST team discussed hearing aids for G.A. Auerbach's March Audiological report recommended an unspecified FM hearing aid and the Board included this recommendation in the IEP. The Board was under the impression that L.A. had purchased an ear-level hearing aid and offered an FM coupled supplement. This technology would attach to G.A.'s privately owned ear level hearing aid and transmit the teacher's voice from a microphone directly into G.A.'s ear-level aid. After the meeting, on July 21, 2010, L.A. corrected the Board's misimpression, stating that G.A. did not yet have a hearing aid, but that she was "researching this issue." The Board agreed that G.A. required assistive technology, relying on the private pediatric audiologist's report, but refused to provide an ear-level hearing aid. Instead, the CST offered another type of FM system, a desktop-level hearing aid. As the teacher spoke into a microphone, the desktop level aid would receive the FM broadcast and amplify the teacher's voice. After the IEP meeting, on August 18, 2010, L.A. signed a purchase agreement for an ear-level hearing aid and mold for $1,843.

The ALJ found that the ear-level hearing aid would have been optimal, but that G.A. would have adequately benefited from either a desk-level or ear-level aid. She concluded that the Board's proposed desk-level hearing aid was appropriate. Furthermore, she found that the hearing aid Plaintiffs purchased was for all waking hours, not specifically for educational benefit. Based on a Department of Education letter, *Letter to Seiler*, 20 I.D.E.L.R. 1216 (OSEP 1993), Judge Kirk found that it was department policy not to reimburse expenses for personal assistive devices that the student would wear regardless of whether he was attending school. Only where the child required a hearing aid to achieve a FAPE, as specified in the IEP, should the technology be provided.

Plaintiffs claim two errors: (1) that the ALJ used an incorrect legal standard; and (2) that the ALJ does not have the expertise to depart from the private audiologist's recommendations.[14]

First, while the ALJ did use the language "sufficient to obtain educational benefit" when ruling on the desktop hearing aid, she earlier articulated the full standard in the opinion: "a satisfactory IEP must provide 'significant learning' and confer 'meaningful benefit.'" (OAL 42 (quoting *T.R. v. Kingwood Tp. Bd. of Educ.*, 205 F.3d 572, 578 (2000)))." Judge Kirk's analysis of the benefits of the aid indicates she used the appropriate standard.

Second, while it is true that the Board did not have an audiologist testify, the ALJ based her ruling on the private audiologist's report. The March 2010 Auerbach report, which is the only audiology report the IEP team had available when developing the IEP, recommended an FM aid. It did not specify the type. Nor did it recommend G.A. purchase an ear-level aid.

---

[14] Plaintiffs also claim that the Board must provide an appropriate aid for social situations outside the classroom and for extracurricular activities. This argument was never presented to the ALJ, and thus is not reached here.

In the March Auerbach report, G.A.'s hearing impairment was characterized as "unilateral mild to moderate sensorineural hearing loss in the left ear and normal hearing in the right ear." In other words, "G. may 'hear' but have difficulty understanding faint or distant speech, especially if the poorer ear is closest to the person speaking." For him, "[l]istening in noise will be more difficult when the normal ear is towards a noise source" or when speech is presented to his left side at a distance. Consequently, the audiologist found that the "best environment for G. will be a quiet environment with the speaker in close proximity and directed to the right ear." Given G.A.'s difficulty hearing sound at a distance, the audiologist recommended, "an FM system for use in the classroom … to afford G. the opportunity to hear the teacher in all listening situations… It will present the teacher's voice at a level perceived as louder than the background noise of the classroom, and listening will be much easier." The report also recommended G.A. "obtain a monaural behind the ear hearing aid" for a "trial period."

Judge Kirk relied on Auerbach's recommendation that the best environment would be a speaker in close proximity to G.A.'s right ear, which is hearing normal. She ruled that the Board's recommendation was appropriate because "a desktop FM system placed on G.A.'s desk would bring the teacher's speech in close proximity to G.A. and could be directed to his right ear ...." As an amplified device, it would present the teacher's voice "louder than the background noise of the classroom." While an ear-level hearing aid would have been optimal, and may have maximized G.A.'s benefit, that was not required. *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999). G.A.'s report indicated that he needed signal amplification to his right ear to receive meaningful benefit, and that is what a desktop FM system provided. The ALJ's finding,

which followed the March Auerbach report, is not invalid merely because the Board did not call its own audiologist to testify.

Plaintiffs contend that subsequent evaluations establish that anything less than an ear-level aid will not provide G.A. meaningful educational benefit. During administrative hearings in December 2010, five months after the Board offered the IEP, Auerbach provided an additional report, which recommended an "ear level personal FM system for use in the classroom." Plaintiffs claim that this suggests that a desktop system would not meet G.A.'s needs. But the record reveals that Ms. Auerbach was unfamiliar with the device offered by the Board. She noted, of speaker systems generally, that they do not function optimally when there is distance between the ear and the source. She concluded that "the best type of FM system for any child with a hearing loss is coupled to the hearing aid." She did not offer the opinion that a desktop would fail to provide G.A. meaningful benefit. There is sufficient evidence to affirm the ALJ's finding of fact that the desktop would provide "meaningful educational benefit."

Based on its motion to expand the record, Plaintiffs rely on an evaluation by the Board Audiologist, Dr. Mindel, who tested G.A. after the administrative hearing. This evaluation, conducted more than two years after the challenged IEP was created, will not be used to second-guess whether the Board's program was reasonably calculated to provide meaningful benefit. *Susan N.*, 70 F.3d at 762. Even if the Court were to rely on this evidence, it does not establish that a desktop FM system would fail to provide G.A. meaningful educational benefit. Instead, Dr. Mindel's analysis shows that G.A.'s ability to hear with his left ear while listening in noise (identified as the situation of greatest concern for G.A.), would be roughly comparable using either a desktop system or an ear-level hearing aid. Thus, even applying this "after-acquired

evidence," the record supports the ALJ's conclusion that a desktop speaker, in conjunction with his hearing normal right ear, would have allowed G.A. to receive "meaningful benefit."


## VI.  CONCLUSION

As in many IDEA cases, where the well-being of a child is at stake, parents are confronted with many complex and sensitive decisions, and the Court sympathizes with parents' concerns in finding the ideal surroundings for their child.  *Schreiber v. Ridgewood Bd. of Educ.*, 952 F. Supp. 205, 210 (D.N.J. 1997).  But the Court also shares the Third Circuit's concern that attorneys representing their own children must "ensure that reason, rather than emotion will dictate the conduct of the litigation."  *Woodside v. Sch. Dist. of Philadelphia Bd. of Educ.*, 248 F.3d 129, 131 (3d Cir. 2001) (internal quotation marks omitted).

For the reasons stated herein, the Court grants River Vale Board of Education's motion for summary judgment in part, and grants Plaintiffs' motion for summary judgment in part, as more fully set forth above. Plaintiffs' cross-motion for post-administrative expenses is denied. Plaintiffs' request for reimbursement of a hearing aid, private tuition and related expenses is denied.  Defendant shall reimburse Plaintiffs for the private evaluation by Dr. Chaye Lamm Warburg, which took place on October 25, 2010, October 28, 2010, and November 1, 2010.  An appropriate Order follows.


/s/ __Faith S. Hochberg_____
**Hon. Faith S. Hochberg, U.S.D.J.**